PRUDENCE B. THOMPSON, Administratrix, Appellee, v. AUGUST
P. THOMPSON, Appellant.

**GIFTS:** How Effected—Evidence—Intention. No stereotyped form
1   of evidence is required in order to effect a gift. *Intention* is the
pivotal question. In the instant case, it was held that a jury
question, whether a father intended to effect a gift to his son of
certain notes, was presented by (1) a series of unconditional as-
signments of, and indorsements on, notes, (2) a power of attorney,
(3) a receipt for said notes and (4) oral testimony in relation
thereto.

**EVIDENCE:** "Parol Evidence" Rule—Nonapplication of Rule—
2   Searching for Intention of Parties. The rule that parol evidence is
inadmissible to contradict or vary the terms of a valid written instru-
ment does not, *in the search for the questionable intention of the
parties,* close the door to oral evidence which is not inconsistent with
the writing.

   PRINCIPLE APPLIED: A son claimed that his father had
made to him a gift of five notes. The representatives of the
estate claimed that the father did nothing more than to constitute
the son his attorney in fact. The evidence bearing thereon was:
(1) A written instrument in the nature of an assignment of the
notes to the son, accompanied by an unconditional indorsement of
the notes to the son, all executed by the father without the knowl-
edge of the son; (2) a *general* written power of attorney (ex-
ecuted some months later) along with five unconditional separate
written assignments of the mortgages securing the notes, with de-
livery of the notes to the son, all executed by the father to the
son with the knowledge of the son; (3) a written receipt for the
notes, executed by a banker to the son, in the presence of the father.
*Held,* oral evidence was admissible by both parties: by the son to
show an *intention* to effect a "gift"; by the representatives of the
estate to show an *intention* to constitute the son an attorney in fact
only.

**GIFTS:** Intention—Series of Written Instruments—Relative Im-
3   portance—Construction. In the consideration of a series of written
instruments, all consistent with either one of two conflicting theories
or contentions, the court was not justified in instructing the jury
that a particular one controlled the others.

PRINCIPLE APPLIED: (See No. 2.) *Held*, the entire series of writings, including the oral testimony, presented the pivotal question of intention and that the general power of attorney was not *per se* the controlling instrument.

TRIAL: Instructions—Submitting Nondisputed Questions—Error.
4   Nondisputed questions should not be submitted to the jury. Such submission held error.

TRIAL: Instructions—Leading Jury away from Ultimate Question—
5   Error. The task set for the jury should be to pass directly and exclusively on the pivotal questions at issue. An instruction which carries the jury away from such pivotal question and assigns to it the task of solving some other question as ''the real test,'' can have no other effect than to lead the minds of the jury away from the pivotal question, with consequent confusion.

PRINCIPLE APPLIED: The question at issue was (a) whether a father had, by a series of instruments, transactions and statements, delivered certain notes to his son as a gift, or (b) had only intended to appoint his son as his attorney in fact. The *intention* of the father was the pivotal question. Instead of instructing the jury to determine this question of *intention*, the court instructed in substance:

''The real test is, if said notes were paid off before the death of the father, would the father have been entitled to the money so paid as his own.'' This thought was repeated in other forms in the same instruction. *Held*, error.

*Appeal from Wapello District Court.*—HON. FRANCIS M. HUNTER, Judge.

SATURDAY, JUNE 19, 1915.

REHEARING DENIED · SATURDAY, OCTOBER 2, 1915.

ACTION at law by the administratrix of the estate of Edward C. Thompson against the defendant to recover for the alleged conversion of certain five notes, the property of the decedent. Defendant admitted the possession of the notes and appropriation thereof to his own use, but denied the conversion and set up a written endorsement and assignment

of each of the same by the decedent to himself. There was a verdict for the plaintiff. The defendant appeals.—*Reversed.*

*Gilmore & Moon,* for appellant.

*John W. Lewis* and *Tisdale & Heindel,* for appellee.

EVANS, J.—This case has one unique feature. The defendant filed a motion for a new trial, based in part upon newly discovered evidence. The newly discovered evidence was that of the plaintiff herself. Defendant's motion for a new trial was supported by the affidavit of the plaintiff, wherein the facts involved in the controversy were set forth as the plaintiff claimed them to be. Such facts supported the contentions of the defendant upon the merits of the case. This motion was resisted by plaintiff's counsel on the ground of want of diligence and other grounds. The plaintiff, Prudence B. Thompson, is the widow of the decedent and the mother of the defendant. The defendant is the son of decedent. Other heirs of the decedent are a daughter and certain children of a deceased son. Originally, Watson Enyart was appointed administrator of the estate. He instituted this suit. Shortly before the trial, however, he resigned, and Prudence B. Thompson was appointed in his stead. The case proceeded in her name in charge of the same counsel. She did not testify upon the trial nor personally appear therein. There was an oral understanding between the opposing counsel that, because of her weak condition, she would not be called by either party. This accounts in part for the somewhat anomalous situation here presented. The real parties interested in the prosecution, other than the plaintiff and defendant, are, of course, the other heirs. This feature of the case is referred to here because it explains some apparent inconsistencies of the parties at various points in the case.

Because of our conclusions upon other features of the case, we do not undertake to pass upon the sufficiency of the

showing of newly discovered evidence as a ground for a new trial.

Edward C. Thompson died November 12, 1909. Some-

1. GIFTS : how effected : evidence : intention.

time prior to his death, he was possessed of certain personal property, consisting of certain notes and money in bank, which is set forth in the plaintiff's abstract as follows:

One by Abbie G. and Eugene Bertrock....$  600.00
Jennie McShane........................ 1,500.00
J. J. Beall........................... 2,500.00
A. I. and Endora Marston.............. 1,500.00
Lottie H. Allen....................... 750.00
F. M. and J. S. Reno.................. 300.00
Note, maker unknown................... 100.00
Money in bank......................... 450.00

$7,700.00

The controversy between the parties arises over the ownership of the first five notes enumerated above. The defendant makes no claim to the last three items. Each of the five notes in question was secured by a mortgage on real estate. The decedent had been ill for some time prior to his death. On the first or second day of January, 1909, he called in two friends to witness a proposed transaction on his part and to aid him therein. These were Allen and McDowell. At that time, he executed the following paper, which is known in the record as Exhibit A:

"Agency, Iowa, Jan. 1st, 1909.

"This is to certify that I have this day transferred to A. P. Thompson, my son, all my notes and mortgages that are now in my possession and owned by me. For to dispose of as he sees fit, and to transact any other business as he may see fit in the premises.

"Signed by me this 1st day of Jany., 1909.

"E. C. Thompson."

This paper was prepared by Allen and was sworn to by the decedent before Allen as a notary public. At the same time, he endorsed the five notes in question as follows:

"Pay to the order of A. P. Thompson.
(Signed)    E. C. Thompson."

The actual writing of this endorsement was done by Mrs. Thompson (the plaintiff herein), under the direction of the decedent. Allen and McDowell both testified in substance that he stated that he intended to give such notes to the defendant (who is generally referred to in the testimony as Gussie). The defendant was not present at this time nor did he know anything about this transaction until October 21st following. Nothing further was done by the decedent until such later date. On October 21st following, he sent for Watson Enyart, cashier of the bank where he transacted his business in the town of Agency, who came to his home at such request. What actually transpired on that day in the way of oral conversation is in dispute. Enyart testified as a witness for the plaintiff as follows:

"He said: 'Watson, I am getting old and not able to get around in good shape. I want you to draw me a paper, draw up some article so my son Gussie here can transact my business and look after my affairs', and he produced an article, a sort of power of attorney. He produced a paper and said it had been drawn up a year before, but he had never had occasion to use it, and he showed it to me and wanted to know if that would do. I looked it over and I told him I was not enough of an attorney to tell whether it was exact or not, but that I had a book of forms up to the bank that I used on such occasions and that I could copy one out of that if he would like. He said: 'Well, you do that for me.' Well, I told him I would have to go back to the bank in order to do that, and so I left and went back to the bank and copied a power of attorney on the typewriter and fetched it down

along with my notary seal and such papers that I have to carry in a big book that I have when I go out on a notary job. I took to his house some blank assignments, my receipt book and my seal. I also took some notes and mortgages that he had left in the bank. It was after noon when I got down to the house the second time. . . . I read to him the power of attorney that I had drawn up and he said that that was all right and he signed it and I put my seal on it, then, I stated to him that in order that Gussie Thompson might be able to release these mortgages without any trouble it would not be a bad idea to have these assignments, and the assignments were made out after we got through, and the old gentleman told me to take the notes back to the bank as I knew these people and they were in the habit of paying the interest there and I gathered up the notes, and Gussie Thompson asked me about the assignments, what he was to do with them, and I told him it would be better for him to take them to the court house and have them recorded, and I left the power of attorney and the assignments with him. I took the notes and mortgages back to the bank. The defendant said nothing to me about what I should or should not do with the notes and mortgages. Exhibit A is the paper the old man showed me when I went down there in the forenoon, the paper which he had had drawn up a year before and had never used, and asked if it would do. . . . After signing the power of attorney, Edward C. Thompson directed one of his granddaughters to sign these papers, these assignments. Then he acknowledged them as his signatures. I am not able to say which one of his granddaughters it was. The notes and mortgages remained at the bank from that time until after the old gentleman's death. . . . There were five assignments in all. I think I filled them out in the bank, all except acknowledgments. I suggested these assignments. I left the power of attorney, Exhibit B, and these assignments, on the table there where we were doing the writing, in E. C. Thompson's house in Agency. The

defendant was present there when I left them.   Exhibit B was the first paper signed, and the assignments were signed immediately following.   I did not see defendant or anyone else than myself from the day I took these notes and mortgages back to the bank until after the old man's death, have anything to do with them.''

The paper then signed by the decedent is known in this record as Exhibit B, and is as follows:

"Agency, Iowa.

"Know all men by these presents, that I, E. C. Thompson, of Agency, Iowa, Wapello county, have made, constituted and appointed and by these presents do make, constitute and appoint my son, A. P. Thompson, my true and lawful agent for the purpose of transacting my business, as, paying out, and collecting in, moneys, signing checks, releasing mortgages, and loaning of my money, giving and granting unto my said agent full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully to all intents and purposes, as I might or could do if personally present.

"In witness whereof, I have hereunto set my hand and seal this 21st day of October, 1909.

"(Signed)   E. C. Thompson.''

Formal written assignments of the mortgages also were executed, and all papers that day signed were similarly acknowledged before Enyart as a notary public.   In addition to the foregoing, it was admitted by Enyart on cross-examination that he executed to the defendant a separate written receipt for each of the five notes now in controversy and that this was done then and there in the presence of the decedent. He also testified on cross-examination:

"I would not say that I did receive these notes from the defendant on October 21st.   They were lying on the table

there, I could not say I received them from the hands of either man, they were lying on the table and Mr. (Edward C.) Thompson told me I had better take them back to the bank, and he turned to his son and said, 'You better have him take them back to the bank.' After he spoke to me, the old man said to his boy, 'You had better let him take them back to the bank,' that in substance. Gussie (the defendant) did let me take them back to the bank, and I gave him these receipts at the time. . . . When I drew this power of attorney (Exhibit B), I was of the opinion that that in itself was not sufficient to enable the defendant, as the old man's agent, to release mortgages. I did not know much about the law on the subject, but I was going a good deal by what I had to do when I wanted to release a mortgage. I never acted under a power of attorney, and am not familiar with its use in general. There was no way to release these mortgages is the reason I told him so that he would not have any trouble in releasing these mortgages. I explained to Mr. (Edward C.) Thompson that if he made the assignments to Gussie and had them recorded that Gussie could go there in person and release these mortgages.''

On re-direct examination he testified as follows:

''The defendant did not say anything to me that day in the way of ordering or instructing me about what I should do with the notes and mortgages. When I started out I left the power of attorney and assignments there and Gussie turned to me and said, 'What shall I do with these?' I told him I thought it would be better to record them.''

On the other hand, there was testimony on behalf of defendant of other witnesses who were present on October 21st to the effect that the decedent said he wanted to give the notes in question to his son Gussie, and that, as he read the paper Exhibit B, when presented to him by Enyart, he said it was not ''strong enough.'' There is no claim that the

decedent ever attempted to exercise any dominion over the property after that date; nor, on the other hand, was there any affirmative act done in relation thereto by the defendant after October 21st and before the death of his father. The oral evidence on behalf of the defendant was sufficient to sustain a finding that the transaction of October 21st was intended by the decedent to consummate a gift of the five notes in question to his son. On the other hand, the oral evidence of Enyart on behalf of the plaintiff was sufficient to sustain a finding that such transaction was intended to clothe the defendant only with the power of an attorney in fact, and for the purpose of enabling him to transact the business of the decedent. The ultimate merits of the case rest upon the question of whether or not the decedent intended a gift to his son.

The theory of the plaintiff appellee was and is that the paper Exhibit B was the "controlling" paper of the case, and that it cannot be contradicted either by the oral evidence or by the instruments; that the other instruments must be construed so as to support it, and all oral evidence inconsistent therewith must be rejected; that Exhibit A should be rejected because it never went into effect and because it was superseded by the subsequent instrument, Exhibit B. In a general way, this theory was adopted in the instructions. The theory thus put forward is somewhat misleading. It may be assumed that Exhibit B may not be contradicted by oral evidence. The same rule applies, however, to the other written instruments. The mere fact that Exhibit B was executed subsequently to Exhibit A is not of itself sufficient to render Exhibit A nugatory. Otherwise, Exhibit B might itself be deemed nugatory because of the subsequent execution of the written assignments of the notes and mortgages. These were absolutely unconditional in form. The oral evidence of gift was admit-

2. EVIDENCE: "parol evidence" rule: non-application of rule: searching for intention of parties.

3. GIFTS: intention: series of written instruments: relative importance: construction.

tedly not inconsistent with any written instrument introduced in evidence, unless it be Exhibit B. Clearly it was not inconsistent with Exhibit A, nor with the endorsements on the backs of the notes, nor with the written assignments of the notes and mortgages, nor with the receipts executed by Enyart to the defendant. Was it necessarily inconsistent with the power of attorney, Exhibit B? We think not, and for two reasons:

(1) The power of attorney was general in its terms and was capable of application to the other notes of the decedent and to the money in the bank. It did not purport to apply to the specific notes in this controversy.

(2) Assuming that the decedent really intended to make a gift of the notes in question, we see no insuperable reason why it might not be shown by oral evidence that a formal power of attorney was executed as a means of effectuating the gift. It would be an awkward means, it is true, but if it were shown that it was actually adopted for that purpose, we see no reason why it should not be deemed effective to that end. It was so held expressly in *Murphy v. Bordwell* (Minn.), 85 N. W. 915. We are of the opinion, therefore, that none of the written instruments appearing in this record were necessarily inconsistent with the alleged intent on the part of the decedent to make a gift of these certain notes to his son; and this is so whether these instruments be considered separately or as parts of one transaction.

On the other hand, there is no statement in any of such written instruments whereby the decedent purported to make a gift of these notes as distinguished from a mere transfer thereof. It follows that it was competent for the plaintiff to show by oral evidence that the several instruments were intended to constitute one instrument and were in effect one transaction and that the real purpose thereof was to clothe the defendant with full power as an attorney in fact. The ultimate question between the parties is: Did the defendant receive these notes as a donee or as an attorney in fact? This

question is not conclusively answered by any written instrument. While it is true that the written assignments and endorsements on the back of the notes would present a good defense to a mere claim of conversion of the notes, it does not follow, in the absence of an intended gift, that the defendant could not be held to some other form of liability by appropriate pleading which would take account of the unpaid consideration, if any.

In here stating the ultimate issue between the parties, we are following the arguments of counsel on this appeal. They agree that the vital issue is as here stated. The case thus argued and the case made by the evidence is not the case made by the pleadings. The petition declared a conversion of the notes. The answer denied the conversion and set up the written assignments. There was no affirmative allegation in the answer of an intended gift. As already indicated, the written assignments standing alone presented a sufficient defense to the claim of conversion. No reply thereto was filed by plaintiff. But the real controversy that developed at the trial was whether there was an intended gift. This was the main issue submitted to the jury and this is the question argued here. We therefore treat the issues as they have been argued before us, rather than as they were pleaded in the court below. This is manifestly to the interest of both parties, in that it enables us to deal with the ultimate merits of the case as disclosed by the evidence. The foregoing analysis of the issues and the evidence will enable us to deal more in detail with the alleged errors assigned.

I. The appellant complains of instruction 21. By this instruction, the trial court submitted to the jury the question of whether there had been any delivery of the notes and

4. TRIAL: instructions: submitting nondisputed questions: error.

mortgages in controversy on October 21st. The instruction is assailed as to the manner in which the question was submitted, and also on the ground that the question should not have been submitted at all. The argument is that delivery

was shown by the undisputed testimony of both sides. We have already recited the facts pertaining to the delivery in our foregoing statement. It appears therefrom that Enyart carried the notes and mortgages with him to the bank, having first signed a receipt for each one to the defendant personally. This was done in the presence of the decedent. The written assignments and the other instruments were taken by the defendant personally. According to Enyart, the decedent said to his son, "You better have him (Enyart) take them back to the bank." Taking the facts as stated by Enyart and not disputed by anyone, they leave no disputed question of delivery to be settled by the jury. Under these undisputed facts, there was a legal delivery of the notes to the defendant on October 21st and the jury should have been so instructed. *Tucker v. Tucker,* 138 Iowa 344; *Stokes v. Sprague,* 110 Iowa 89; *Irwin v. Deming,* 142 Iowa 299; *Poullain v. Poullain,* 79 Ga. 11.

True, such delivery did not of itself prove the gift. But if the intent to make the gift was proved, then such delivery effectuated the gift. On the other hand, if only an agency was intended, then the delivery was in pursuance of the agency. In other words, whatever transaction was intended on that day was effectuated by adequate delivery.

II. Appellant complains of instruction 6. Such instruction contained the following statement:

5. TRIAL: instructions: leading jury away from ultimate question: error: ". . . The plaintiff claims that said Edward C. Thompson retained to himself and at the time of his death was the actual and real owner of said notes and mortgages. Now *the real test is,* if said notes, or any part of them, were paid off after October 21st, 1909, and before the death of Edward C. Thompson, would Edward C. Thompson have been entitled to the money so paid on the notes, to keep, use, spend or otherwise dispose of as he might elect, without the knowledge or permission of any other person, just as men usually

keep, control and spend their own money? If you find Edward C. Thompson would have been so entitled to the proceeds of said notes, if they or any part of them had been paid during that period of time, no matter whether paid to him personally or to any other person; then he was the actual and real owner of the said notes and mortgages at the time of his death, even though the endorsements had been made on the notes and the mortgages had been transferred, and even if the notes and mortgages may have been, at the time of such supposed payment, in the possession of some other person or persons.''

We think it must be said that the effect of this instruction was to lead the jury away from the pivotal question. Of course, if the decedent did not make a gift of the notes to his son, then he necessarily remained the owner thereof until his death. The jury could not say whether he was or was not the owner without first determining the question of whether he had made a gift to the son. *This was the test.* The other followed as a necessary result.

III. We think, also, that the exception to instruction No. 10 must be sustained. This instruction treated the provisions of Exhibit B as being controlling and decisive if it was intended to include the notes and mortgages now in controversy; that is to say, if all the instruments should be regarded as one transaction. This ignored the question of whether a gift was actually intended and whether the written instruments, including Exhibit B, were made with the intent to effectuate the gift. It treated Exhibit B as being necessarily contradictory in its terms to the claim of gift, and to be decisive against such claim in the event that only one transaction was intended. As already indicated, we find that there is nothing in the terms of Exhibit B which would necessarily forbid the fact of gift to be found.

What we have already said is quite decisive of all the questions argued before us in the very extensive briefs of

counsel. The one controlling question of fact in the case is: Was or was not a gift intended by the decedent? That question being answered, all else follows. If a gift was intended, there was sufficient delivery to effectuate it. If a gift was not intended, there was no gift. Whatever the intent, the delivery effectuated it.

For the reasons indicated, a new trial must be awarded, and the judgment below is therefore—*Reversed.*

DEEMER, C. J., WEAVER and PRESTON, JJ., concur.